**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| C&E SERVICES, INC. and<br>CARL L. BIGGS<br><br>          Plaintiffs,<br><br>          v.<br><br>ASHLAND, INC.,<br><br>          Defendant. | )<br>)<br>)<br>)<br>)<br>) Civil Action No. 03-1857(EGS)<br>)<br>)<br>)<br>)<br>) |

<u>**MEMORANDUM OPINION**</u>

Plaintiffs, C&E Services, Inc. ("C&E") and Carl L. Biggs, filed a complaint against defendant, Ashland, Inc. ("Ashland"), alleging that defendant engaged in an unlawful scheme whereby plaintiffs were deceived into placing defendant's defectively priced products on plaintiffs' federal government contract for eventual resale to the federal government. Plaintiffs allege that defendant misrepresented and concealed material facts with regard to the status of its products' prices, which, unbeknownst to plaintiffs, had previously been alleged to be "defective" by the federal government. As a result of defendant's scheme, plaintiffs were investigated by federal agencies and the U.S. Attorney's office and their government contracting rights were suspended. Plaintiffs' complaint states six counts against defendant, alleging fraud, negligent misrepresentation, indemnification, equitable indemnification, breach of the implied

1

covenant of good faith and fair dealing, and breach of fiduciary duty.  Pending before this Court are defendant's Motion for Summary Judgment and plaintiffs' Motion to Strike Ashland's Motion for Summary Judgment.  Upon consideration of the motions, the responses and replies thereto, the applicable law, and the entire record, the Court **GRANTS in part** defendant's motion for summary judgment with regard to Count Three (indemnification) and Count Four (equitable indemnification), **DENIES in part** defendant's motion with regard to all other counts, and **DENIES** plaintiffs' motion to strike as moot.

BACKGROUND

**I.   Parties**

Plaintiff, C&E, is a minority-owned Virginia corporation that provides wastewater treatment products and services to commercial and federal, state, and local government customers. 2d Am. Compl. ¶ 3.  Plaintiff Carl L. Biggs is the owner and chief executive officer of C&E.  *Id.* ¶ 4.  Plaintiffs[1] conduct their business in Washington, D.C., Virginia, and Maryland among other places.  *Id.* ¶ 3.  Prior to becoming the owner and chief executive officer of C&E, Biggs was employed by defendant, Ashland, in one of its business units, Drew Industrial Division,

---

[1] For the purposes of this memorandum opinion, the Court refers to C&E and Biggs together as "plaintiffs" unless otherwise indicated.

from April 1977 to August 1987.  Biggs Dep., Ex. 9 to Def.'s Mem. in Supp., at 16:22-17:10.

Defendant is a publicly-traded company, incorporated in Kentucky.  2d Am. Compl. ¶ 5.  Defendant has its principal office in Covington, Kentucky, and also has one of its several main offices in Washington, D.C.  Defendant's corporation is comprised of five large industry divisions, including Ashland Specialty Chemical Company, which manufacturers water treatment chemicals. *Id.*  In addition, defendant's business units include, Drew Industrial Division, which supplies specialized chemicals and consulting services for the treatment of water.  *Id.*

## II.   Defendant's GSA Contract and Audit

In December 1991, the U.S. General Services Administration ("GSA") awarded defendant a Multiple Award Schedule ("MAS") contract, through which defendant, from 1991 to 1997, sold water treatment products directly to government customers.  2d Am. Compl. ¶ 16.  The GSA administers the contractual MAS program whereby the federal government purchases commercial products and services.  Pls.' Opp'n at 7.  The GSA negotiates MAS contracts with suppliers for delivery of commercial products or services commonly used by the federal government in order to provide a simplified process of acquiring supplies and services and obtaining volume discounts.  *Id.*

After the award of a MAS contract, a contractor must submit to audits by the GSA.  Koehl Dep., Att. 3 to Pls.' Opp'n, at 16-17.  As a result of an audit, a contractor may be required to provide price adjustments to the government similar to any discounts offered to comparable commercial customers.  *Id.* at 43.  In addition, audits can also find that detailed pricing information submitted prior to the award of a MAS contract is "defective," meaning that the contractor provided false or misleading data to the government for use in evaluating proposed prices.  *Id.*; *see also Gelco Space*, App. 1 to Pls.' Opp'n, General Services Board of Contract Appeals Nos. 7916 & 7917, 91-1 BCA ¶ 23,387.

In 1996, the GSA began an audit of defendant's MAS contract. Draft Audit Report, Ex. 1 to Def.'s Mem. in Supp., at ASH 014635, 014642.  On May 13, 1997, the GSA submitted its Draft Audit Report[2] to defendant alleging that, prior to the contract award in 1991, defendant submitted pricing data that was "inaccurate and incomplete, and [defendant] misled GSA contracting officials during negotiations."  Draft Audit Report at ASH 014642.  The

---

[2]  Plaintiffs contend, and defendant does not argue otherwise, that "[a] 'draft' audit report is a common practice in GSA contracting investigations and is often the only notice a GSA contractor will receive about the substance of the government's position on the type of problems found in the contractor's prices."  Pls.' Opp'n at 7 n.4 (citing Koehl Aff., Att. 2 to Pls.' Opp'n, ¶ 12).  Nevertheless, in January 1998, the GSA provided a final audit report to defendant.  Post Award Audit Report, Att. 1, Ex. H to Pls.' Opp'n.

GSA, therefore, concluded that defendant's prices were "defective," and that Ashland owed the government $814,841.00 for the pricing violations. *Id.* Specifically, the GSA determined that defendant had offered non-government customers discounts off of defendant's list prices between 16 and 67 percent, while defendant told the GSA that 15 percent was the highest discount it had offered to any customer. *Id.* at ASH 014643. Although defendant disputed the GSA's claims, on December 11, 1997, defendant executed a settlement agreement with the GSA. Settlement Agreement, Ex. 4 to Def.'s Mem. in Supp., at 3. Defendant was required to pay the government $1,798,274.00 but there was no admission of wrongdoing or liability. *Id.* at 3, 6.

## III. 1987 Agreement, 1997 Discussions, and 1998 Agreement

Sometime in 1997,[3] while defendant was negotiating its settlement agreement with the government, plaintiffs and defendant began discussions in regard to whether plaintiffs were interested in taking over defendant's sales operation as a distributor of defendant's water treatment products. Biggs Dep., Att. 6 to Pls.' Opp'n, at 24-25. Defendant asserts that plaintiffs were a "natural choice" to take over defendant's government contracting business because Biggs had sold

---

[3] Plaintiffs assert that these discussions began in early 1997 whereas defendant asserts they began in late 1997. *Compare* Pls.' Statement of Genuine Issues at 1, *with* Def.'s Statement of Material Facts at 1.

defendant's water treatment products as defendant's employee
prior to 1987 and C&E had its own GSA-approved MAS contract for
distributing water treatment chemicals. *See* Biggs Dep., Ex. 9 to
Def.'s Mem. in Supp., at 16:22-17:10.  In addition, pursuant to a
1987 sales agreement between plaintiffs and defendant, C&E was an
authorized sales representative for defendant.  1987 Agreement,
Att. 5, Ex. A to Pls.' Opp'n.  The 1987 Agreement defined the
relationship between plaintiffs and defendant as "that of
principal and agent ." *Id.* at ASH 002430.  During the
discussions in 1997, plaintiffs and defendant were still under
contract pursuant to the 1987 Agreement. *See id.*

According to defendant, during these discussions, defendant
was open about its reasons for getting out of the government
contracting business, specifically informing plaintiffs that: (1)
the GSA audited defendant's MAS contract; (2) the auditors found
pricing issues with defendant's MAS contract, including sales by
defendant to non-government customers at prices lower than those
that had been offered to defendant's GSA customers; (3) the
auditors alleged damages of at least $600,000 to $800,000; (4)
defendant paid a settlement to resolve the government's claims
arising from the audit; and (5) defendant was cancelling its GSA
contract.  Def.'s Statement of Material Facts ¶ 2.

Plaintiffs, however, assert that defendant never informed
plaintiffs that the GSA auditors found defendant's prices

6

defectively negotiated in the first place and that defendant knew that plaintiffs would not be able to sell defendant's products at the prices listed in defendant's GSA contract. *See* Draft Audit Report; Post Award Audit; Saunders Dep., Att. 4 to Pls.' Opp'n, at 75.  Plaintiffs further assert that defendant never informed plaintiffs that defendant was under investigation by the U.S. Attorney's Office and the government was considering a False Claims Act action against defendant as a result of the defective pricing. *See* Answer and Countercl. ¶ 26.  Finally, plaintiffs assert that defendant neither informed plaintiffs that defendant settled with the government for over $1.7 million in double damages under the False Claims Act nor informed plaintiffs that the government provided defendant with both a draft and final audit report detailing the defective pricing allegations. *See* Biggs Aff., Att. 5 to Pls.' Opp'n, at ¶ 6; *see also* Draft Audit Report; Post Award Audit; Answer and Countercl. ¶ 31.  In effect, plaintiffs assert that defendant did not inform them of general pricing issues or problems, but rather made specific representations regarding the nature of the problem: "during the performance of [defendant's] GSA contract some [of defendant's] salespersons gave commercial customers a better price than the government received."  Pls.' Statement of Genuine Issues ¶ 2. Furthermore, plaintiffs assert that in December 1997, defendant informed Biggs that there would be no problem submitting

7

defendant's products onto plaintiffs' GSA contract at the very
same prices found on defendant's GSA contract which, allegedly
unbeknownst to plaintiffs, had previously been determined to be
"defective."  Biggs Aff., Att. 5 to Pls.' Opp'n, ¶ 7; Kuchinski
Dep., Att. 7 to Pls.' Opp'n, at 151-54.

At the conclusion of these discussions, plaintiffs and
defendant signed a distributorship agreement effective January 1,
1998 ("1998 Agreement").  Def.'s Statement of Material Facts ¶ 3.
Pursuant to the relevant terms of the 1998 Agreement, the prior
principal/agent relationship between the parties was transformed
into one of contractor and subcontractor where neither party was
subject to the control of the other.  1998 Agreement, Ex. 12 to
Def.'s Mem. in Supp., at 3.  The 1998 Agreement required
plaintiffs to seek and obtain approval from the GSA to add
defendant's water treatment products to plaintiffs' GSA contract.
Def.'s Statement of Material Facts ¶ 4.

## IV.  GSA Investigation and Audit of Plaintiffs

On January 14, 1998, plaintiffs submitted a modification
request to the GSA to add defendant's products onto plaintiffs'
GSA schedule.  Request for Modification, Ex. 16 to Def.'s Mem. in
Supp.  In their modification request, plaintiffs submitted
defendant's products at the same prices previously deemed
defective by the government.  *See* Letter from C&E to Flannery,
Att. 5, Ex. B to Pls.' Opp'n.  Although defendant asserts that

8

plaintiffs knew defendant's prices had been the subject of government concerns, Def.'s Mem. in Supp. at 6, plaintiffs claim that in December 1997, defendant informed Biggs that there would be no problem submitting defendant's products onto plaintiffs' GSA contract at the very same prices found on defendant's GSA contract. Biggs Aff. ¶ 7; Kuchinski Dep. at 151-54. Furthermore, plaintiffs assert that they did not know the products were determined to be defectively negotiated and priced prior to the GSA contract award to defendant in 1991.[4]  *See* Biggs Aff. ¶ 12; Draft Audit Report at ASH 014642.

By 2001, the GSA had still not approved plaintiffs' modification request. *See* Pls.' Opp'n at 13, 15.  Defendant claims that plaintiffs, however, in making sales to government customers, misrepresented that defendant's products were approved on their GSA schedule.  Def.'s Statement of Material Facts ¶ 10. Accordingly, defendant asserts that from 1998 to 2001, plaintiffs made unapproved sales of defendant's products to government customers. *Id.*  Plaintiffs' allegedly made these unapproved

---

[4] Plaintiffs highlight the relevance of the GSA's audit report finding that defendant defectively negotiated prices *prior to* their GSA contract award in 1991.  Plaintiffs assert that the GSA audit report concluded that defendant's prices were defectively negotiated in the first place.  *See* Draft Audit Report, Att. 1, Ex. C to Pls.' Opp'n; Post Award Audit, Att. 1, Ex. H to Pls.' Opp'n.  As such, plaintiffs contend that the GSA was never going to approve defendant's products on plaintiffs' modification request at the prices previously determined to be defective.  *See* Biggs Aff. ¶ 12; Biggs Dep., Att. 11 to Pls.' Opp'n, at 162-64.

sales even though plaintiffs knew about the GSA audit and
defendant's previous pricing problems.   *Id.*

Plaintiffs dispute this contention, asserting that
plaintiffs informed government customers of the status of
plaintiffs' application for adding defendant's products to their
GSA Schedule contract, and in addition, informed government
customers that any purchases would not be made using plaintiffs'
GSA Schedule.  Pls.' Statement of Genuine Issues ¶ 10.
Plaintiffs further assert that while the modification request was
pending, plaintiffs sold defendant's products as "open market
orders," and accordingly, did not act inappropriately or
deceptively.  *See* Pls.' Statement of Genuine Issues ¶ 10.
Plaintiffs point out that they devoted substantial time and
resources in the attempt to obtain approval for their
modification request.  Biggs Aff. ¶ 9.  For nearly three years,
plaintiffs submitted additional request information, resubmitted
entire packages of information, and called a Congressman to look
into the delay in approval.  *Id.*

Plaintiffs contend that it was in fact defendant who falsely
represented to government customers that plaintiffs had added
defendant's products onto their Schedule Contract, and that it
was defendant's false representations that resulted in an
investigation and audit of plaintiffs by the GSA Office of
Inspector General ("OIG").  Letter from Key to Hannon, Att. 1,

Ex. I to Pls.' Opp'n; Flannery Dep., Att. 10 to Pls.' Opp'n, at
42-42; Letter from Zdilla to Cox, Att. 1, Ex. K to Pls.' Opp'n.

Although defendant contends that plaintiffs were well aware
of the pricing problems in regard to defendant's products by
1998, plaintiffs dispute all of defendant's allegations that
plaintiffs knew the extent and nature of defendant's defective
pricing prior to June 16, 2000.  According to defendant, shortly
after plaintiffs' modification request submission, the GSA
contracting officer responsible for processing this request,
Sharon Flannery, informed plaintiffs that the GSA had previously
had issues with the prices listed for defendant's products.
Def.'s Statement of Material Facts ¶ 5.  Furthermore, defendant
claims that in January through March 1998, during plaintiffs'
discussions with the GSA in regard to adding defendant's products
to plaintiffs' GSA schedule, GSA auditor Glenn Merski advised
Biggs that the GSA had previously determined that defendant's
prices were neither fair nor reasonable.  *Id.* ¶ 6.  Plaintiffs,
however, contend that Flannery neither informed plaintiff of the
results of the GSA audit of defendant nor informed plaintiffs
that defendant's prices were "defective."  *See* Pls.' Statement of
Genuine Issues ¶ 5.  Further, plaintiffs contend that Biggs
specifically asked for a copy of any audit report from defendant,
and defendant denied there was an audit report.  Pls.' Additional
Genuine Issues ¶ 1.  In addition, plaintiffs contend that Merski

11

only told Biggs "offhandedly that he [Merski] thought [defendant's] prices were 'high.'" *Id.* ¶ 6.  Plaintiffs assert that the extent of their knowledge concerning defendant's pricing problems was that some of defendant's salespersons gave commercial customers a better price than the government received. *Id.* ¶ 7

     According to plaintiffs, it is only as a result of the information provided by the GSA during the course of its investigation and audit of plaintiffs that plaintiffs finally learned defendant's products were defectively priced.  During an interview on June 16, 2000, conducted by GSA-OIG investigator Sylvia Bergstedt, Biggs learned for the first time the true nature of defendant's audit.  Biggs Aff. ¶ 12; Biggs Dep., Att. 11 to Pls.' Opp'n, at 162-64.  Bergstedt informed Biggs that defendant's products would never be approved for plaintiffs' schedule because they were defectively priced.  *Id.*

     As a result of this audit, the GSA-OIG served search warrants on plaintiffs, and ultimately recommended and obtained plaintiffs' temporary suspension from federal government contracting.  Defendant contends that GSA-OIG auditors determined that plaintiffs' employees attempted to obstruct the audit by, among other things, providing auditors with altered sales invoices and falsely representing that they could not locate any written purchase orders.  Def.'s Statement of Material Facts ¶

12; Merski Dec., Ex. 20 to Def.'s Mem. in Supp., ¶¶ 7, 8;
Recommendation for Suspension, Ex. 14 to Def.'s Mem. in Supp., at
CES 2695, 2697-98.  Defendant further contends that the GSA-OIG
concluded, in its Recommendation for Suspension, that plaintiffs
"engaged in a conspiracy to defraud the government, engaged in
deceptive business practices, made false certifications,
obstructed a federal audit, and submitted false claims to various
federal agencies for agencies' purchases made under [plaintiffs']
General Services Administration (GSA) Multiple Award Schedule
(MAS) contract."  Def.'s Statement of Material Facts ¶ 14.

Plaintiffs, however, dispute that they acted improperly and
contend that to date "neither [Biggs], anyone at C&E, nor C&E
itself has been charged with any crime, sued by the [g]overnment,
or settled with the [g]overnment involving any of the issues in
this lawsuit."  Biggs Aff. ¶ 14.  Plaintiffs assert that the
Recommendation for Suspension is preliminary by nature and is
directly acknowledged in the report.  Pls.' Statement of Genuine
Issues ¶ 12.  Plaintiffs also point out that the suspension was
lifted after plaintiffs had the opportunity to discuss the
allegations with the GSA, which thereby indicates that any
preliminary conclusion by the auditors was either unwarranted or
reserved.  Pls.' Statement of Genuine Issues ¶ 12.

On June 16, 2003, exactly three years after plaintiffs
allegedly first learned that defendant's prices were defective,

13

plaintiffs filed their complaint in this Court.  Plaintiffs'
complaint states six counts against defendant, alleging fraud,
negligent misrepresentation, indemnification, equitable
indemnification, breach of the implied covenant of good faith and
fair dealing, and breach of fiduciary duty.  Plaintiffs seek: (1)
compensatory damages not less than $2.7 million; (2) punitive
damages not less than $13.5 million; (3) indemnification for
legal expenses and other damages; (4) attorneys' fees and costs
with regard to bringing and maintaining this case before the
Court; (5) pre- and post-judgment interest from defendant; and
(6) any other relief the Court deems appropriate.  Following
discovery, defendant filed its Motion for Summary Judgment with
regard to all of plaintiffs' claims.  In addition to opposing
defendant's motion, plaintiffs also filed their Motion to Strike
Ashland's Motion for Summary Judgment or Disregard Certain
Evidence Submitted in Support Thereof.  Plaintiffs' motion seeks
to strike defendant's motion or, in the alternative, evidence in
support of its motion, because of alleged evidentiary
inadequacies.

## ANALYSIS

## I.   Standard of Review

Pursuant to Rule 56 of the Federal Rules of Civil Procedure,
summary judgment should be granted only if the moving party has
shown that there are no genuine issues of material fact and that

the moving party is entitled to judgment as a matter of law.
Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 325
(1986); *Waterhouse v. District of Columbia*, 298 F. 3d 989, 991
(D.C. Cir. 2002).  In determining whether a genuine issue of
material fact exists, the Court must view all facts in the light
most favorable to the non-moving party.  *See Matsushita Elec.
Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).
However, "[t]he mere existence of a scintilla of evidence in
support of the [non-moving party's] position will be
insufficient" to defeat summary judgment.  *Anderson v. Liberty
Lobby, Inc.*, 477 U.S. 242, 252 (1986).  If the non-moving party
fails to offer "affirmative evidence" showing a genuine issue for
trial, summary judgment is appropriate.  *Id.* at 257.  To preclude
summary judgment, the non-movant must proffer evidence on which a
jury could reasonably return a verdict for the non-moving party.
*Id.*; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir.
1987).

## II.  Fraud and Negligent Misrepresentations Claims[5]

---

[5] Federal jurisdiction in this case is based on diversity of
citizenship, 28 U.S.C. § 1332, and accordingly, state law
provides the substantive rules of law with regard to all claims
in this case, *see Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78
(1938).  Although defendant initially contends that the Court
"should apply Virginia law," defendant then states that it "has
assumed D.C. law to apply for the purposes of this Motion [for
Summary Judgment]."  Def.'s Mem. in Supp. at 18.  Plaintiffs
assert that there is no substantial difference with regard to the
claims in this case between D.C. law and Virginia law, Pls.'

Count One of plaintiffs' second amended complaint states a cause of action against defendant for fraud.  In order to establish a claim for fraud under District of Columbia law, a plaintiff must prove: (1) the defendant made a false representation; (2) in reference to a material fact; (3) with knowledge of its falsity; (4) with the intent to deceive the plaintiff; (5) the plaintiff acted in reasonable reliance on that representation; (6) which consequently resulted in provable damages.  *See Atraqchi v. GUMC Unified Billing Servs.*, 788 A.2d 559, 563 (D.C. 2002); *Dresser v. Sunderland Apartments Tenants Ass'n, Inc.*, 465 A.2d 835, 839 (D.C. 1983); *Alicke v. MCI Commc'n Corp.*, 111 F.3d 909, 912 (D.C. Cir. 1997).

Count Two of plaintiffs' second amended complaint states a cause of action against defendant for negligent misrepresentation.  In order to establish a claim for negligent misrepresentation under District of Columbia law, a plaintiff must prove: (1) the defendant made a false statement or omission of a fact; (2) the statement or omission was in violation of a

---

Opp'n at 17-18 n.5, and defendant does not contend otherwise in its reply brief.  "Unlike jurisdictional issues, courts need not address choice of law questions *sua sponte*."  *In re Korean Air Lines Disaster of Sept. 1, 1983*, 932 F.2d 1475, 1495 (D.C. Cir. 1991).  Furthermore, a party may waive a choice of law argument. *See CSX Transp., Inc. v. Commercial Union Ins. Co.*, 82 F.3d 478, 482-83 (D.C. Cir. 1996).  Because defendant "assume[s] D.C. law to apply," supports the arguments made in its motion with D.C. law, and does not dispute plaintiffs' contention that there is no substantial difference between D.C. and Virginia law, the Court applies D.C. law to this case.

duty to exercise reasonable care; (3) the statement or omission involved a material issue; (4) the plaintiff reasonably relied on the false information to his or her detriment; (5) the defendant's challenged conduct proximately caused injury to the plaintiff. *Burlington Ins. Co. v. Okie Dokie, Inc.* ("*Burlington II*"), 398 F. Supp. 2d 147, 153 (citing *Redmond v. State Farm Ins. Co.*, 728 A.2d 1202, 1207 (D.C. 1999)).

Defendant challenges plaintiffs' fraud and negligent misrepresentation claims on multiple grounds which are addressed below.

## A.    Proximate Cause

Pursuant to District of Columbia law, in order to recover for either a fraud or negligent misrepresentation claim, a plaintiff must prove "that the defendant's challenged conduct proximately caused [the] plaintiff's injury." *Steele v. Isikoff*, 130 F. Supp 2d 23, 34 (D.D.C. 2000) (citing *Thompson v. Shoe World, Inc.*, 569 A.2d 187, 189 (D.C. 1990)); *see also Dresser*, 465 A.2d at 839 (holding plaintiff must prove damages proximately and directly caused by defendant's conduct). A defendant's challenged conduct is the proximate cause of a plaintiff's injury "only if 'the injury is the natural and probable consequence of the negligence or wrongful act and ought to [have been] foreseen in light of the circumstances.'" *Steele*, 130 F. Supp. 2d at 34 (quoting *Sanders v. Wright*, 642 A.2d 847, 849 (D.C. 1994)).

17

"Proximate cause has two components: 'cause-in-fact' and a 'policy element' which limits a defendant's liability when the chain of events leading to the plaintiff's injury is unforeseeable or 'highly extraordinary' in retrospect." *Majeska v. Dist. of Columbia*, 812 A.2d 948, 950 (D.C. 2002). The "cause-in-fact" component (also referred to as "legal cause") of proximate cause does not require proof of causation to a certainty but rather requires that a defendant's conduct "is a substantial factor in bringing about the harm." *Id.* at 951 (quoting Restatement (Second) of Torts § 431)). The "policy element" of proximate cause (also referred to as foreseeability) "includes various factors which relieve a defendant of liability even when his actions were the cause-in-fact of the injury." *Majeska*, 812 A.2d at 951 (holding defendant was not liable for harm actually caused "where the chain of events leading to the injury appears 'highly extraordinary in retrospect'"). District of Columbia law is clear that "[o]nly in exceptional cases will questions of . . . proximate cause pass from the realm of fact to one of law." *Id.* (holding trial court erred in granting motion for judgment as a matter of law because a rational juror could have found defendant proximately caused plaintiff's injury).

Defendant contends that there is no genuine dispute that plaintiffs' alleged damages were proximately caused by plaintiffs' own fraudulent and negligent conduct and not by the

conduct of defendant.  Defendant argues that even if it is
assumed that defendant did not inform plaintiffs about the
defective pricing issue, "C&E cannot escape the fact that the
suspension of its GSA contract and the subsequent government
investigations . . . were caused by C&E selling [defendant's]
products using C&E's MAS contract without GSA approval, and by
C&E's efforts to obstruct the GSA's audit of its MAS contract."
*See also* Recommendation for Suspension at CES 2695, 2697-98.
According to defendant, plaintiffs, "on [their] own volition and
without GSA approval of its modification request, sold products
to government customers using its GSA contract number."

Plaintiffs, however, dispute these contentions.  Although
plaintiffs admit they sold defendant's products without GSA
approval, plaintiffs assert that this was a legitimate legal
action because the products were sold as "open market orders."
Biggs Aff. ¶ 8.  Plaintiffs, moreover, assert that defendant's
"sales personnel directly and incorrectly informed government
purchasers that [defendant's] products could be purchased via
[plaintiffs'] GSA Schedule contract."  Letter from Zdilla to Cox,
Att. 1, Ex. K to Pls.' Opp'n, at ASH 011060; Zdilla Dep., Att. 12
to Pls.' Opp'n, at 40-42.  According to plaintiffs, the GSA began
its audit of plaintiffs because of the direct and incorrect
information provided by defendant's sales personnel to government
purchasers.  *See* Flannery Dep. at 42-43.  Contrary to defendant's

19

assertion that plaintiffs proximately caused their injury, plaintiffs argue that they acted lawfully.  Plaintiffs contend that their injury was proximately caused by defendant's alleged fraudulent or negligent misrepresentations about its pricing problems to plaintiffs in addition to the direct and incorrect assertions from defendant's sales personnel that defendant's products could be purchased on plaintiffs' GSA contract.  *Id.* Because proximate cause is only a matter of law in "exceptional cases," *Majeska*, 812 A.2d at 915, and because there are genuine disputes of material fact, the Court finds that plaintiffs' fraud and negligent misrepresentation claims survive defendant's motion with regard to proximate cause.

**B.    Damages**

In order to recover under a fraud or negligent misrepresentation claim, a plaintiff's "proof of damages [is] crucial."  *Kitt v. Capital Concerts, Inc.*, 742 A.2d 856, 861 (D.C. 1999) (citing *Dresser*, 465 A.2d at 839).  Although a plaintiff does not need to prove an amount of damages precisely, "the fact of damage and a reasonable estimate must be established."  *Garcia v. Llerena*, 599 A.2d 1138, 1142 (D.C. 1991).  In effect, though "mathematical certainty" is not required, there must be some "reasonable basis on which to estimate damages."  *Id.*

Within defendant's argument with regard to proximate cause,
defendant contends that, even if defendant improperly withheld
information about defective prices, "the only damages C&E should
have suffered are those associated with its initial application
to add [defendant's] products to C&E's GSA Schedule at prices
that ultimately would not be accepted by the GSA."  Def.'s Mem.
in Supp. at 22 (emphasis in original).

Plaintiffs contend, however, that plaintiffs' damages "arise
primarily because they were sent on a 'fool's errand' by
[defendant], attempting to submit [defendant's] products at
prices that [defendant] knew the government had already found
defective and would not approve."  Pls.' Opp'n at 24 (citing
Biggs Aff. ¶¶ 6, 7; Koehl Aff. at ¶ 9).  Accordingly, plaintiffs
not only claim damages based on the investigation and audit of
plaintiffs by the GSA, but also claim damages as a result of the
years spent attempting to get defendant's products approved and
the resulting lost business opportunities.  Biggs Aff. ¶ 9; *see
also* Jackson Dec., Ex. 6 to Def.'s Reply, at 13 (plaintiffs'
damages expert estimating from 1998-2004, plaintiffs lost
$225,524 on sales of defendant's products earning a twenty
percent commission and $116,427 on sales earning a five percent
commission); 2d Am. Compl. ¶¶ 72, 78.

Defendant contends that Jackson's finding that plaintiffs
lost over $300,000 in sales on commission is based on faulty

reasoning and analysis.   However, viewing all facts in the light
most favorable to plaintiffs, plaintiffs have pleaded and argued
that they suffered damages as a proximate result of defendant's
fraudulent and negligent misrepresentations, these
misrepresentations resulted in sending plaintiffs on a "fool's
errand," and this "fool's errand" resulted in lost profits.
Biggs Aff. ¶ 9; *see also* Jackson Dec. at 13.   As such, the Court
finds that plaintiffs' fraud and negligent misrepresentation
claims survive defendant's motion with regard to damages.

### C.   Duty to Disclose

Defendant next contends that plaintiffs' fraud and negligent
misrepresentation claims fail because defendant was under no duty
to disclose any information concerning its GSA audit and
settlement with the government.   In its motion, defendant
contends that plaintiffs and defendant were not in a fiduciary
relationship, and accordingly, that defendant was under no duty
to disclose any particular facts to plaintiffs.   Plaintiffs point
out, however, that a fiduciary relationship is irrelevant to
plaintiffs' fraud and negligent misrepresentation claims.
According to plaintiffs, once defendant began making affirmative
statements with regard to defendant's GSA audit, they were
required to provide all information materially qualifying those
facts.   *See Ehrlich v. Real Estate Comm'n*, 118 A.2d 801, 802
(D.C. 1955).

22

In its reply, defendant admits that an incomplete disclosure may be construed as a false representation, but then argues that the allegedly omitted information regarding defective pricing does not materially qualify. *See Borzillo v. Thompson*, 57 A.2d 195, 198 (D.C. 1948)). Accordingly, because the parties' arguments surrounding defendant's duty to disclose center on materiality, the Court focuses its inquiry on whether the allegedly omitted information regarding defective pricing information is material.

## D.   **Materiality**

To establish whether a representation is material, the Court determines if: "(a) a reasonable man would attach importance to its existence or non-existence in determining his choice of action in the transaction in question; or (b) the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action, although a reasonable man would not so regard it." *Burlington Ins., Co. v. Okie Dokie, Inc.* ("*Burlington I*"), 368 F. Supp. 2d 83, 87-88 (D.D.C. 2005) (citing *Ward Dev. Co., Inc. v. Ingrao*, 64 Md. Ct. Spec. App. 645 (Md. 1985)).[6]  In effect, a representation is material if it

---

[6] Although the district court cited to Maryland precedent, the district court noted that "Maryland authorities interpreting Maryland common law constitute 'powerful precedent' when District of Columbia courts interpret District of Columbia common law because District of Columbia common law is based on Maryland

reasonably influences a plaintiff to take an action he or she may have refrained from taking if aware of the actual facts. *High v. McLean Fin. Corp.*, 659 F. Supp. 1561, 1567 (D.D.C. 1987).

Defendant contends that it fulfilled any possible duty it had to disclose information by "providing [plaintiffs] with all the information about the audit and the settlement necessary for [plaintiffs] to make an informed decision as to whether to enter into the 1998 Agreement (or at the very least, to demand that [defendant] provide more details prior to executing the 1998 Agreement)." Def.'s Mem. in Supp. at 24.  Defendant states that prior to plaintiffs signing the 1998 Agreement and submitting their modification request to the GSA, defendant told them: (1) the GSA audited defendant's MAS contract; (2) the auditors found pricing issues with defendant's MAS contract, including sales by defendant to non-government customers at prices lower than those that had been offered to defendant's GSA customers; (3) the auditors alleged damages of at least $600,000 to $800,000; (4) defendant paid a settlement to resolve the government's claims arising from the audit; and (5) defendant was cancelling its GSA contract.  Def.'s Statement of Material Facts ¶ 2; *see also* Roenick Dep., Ex. 11 to Def.'s Mem. in Supp., at 27:25-28:4; Biggs Dep., Ex. 9 to Def.'s Mem. in Supp., at 153:13-154:9,

---

common law.  *Burlington I*, 368 F. Supp. 2d at 88 n.1 (citing *Newby v. United States*, 797 A.2d 1233, 1243 n.13 (D.C. 2002)).

160:14-22, 160:7-11, 166:17-24, 243:23-244:2.  Defendant
concludes its argument by stating that "there is nothing in the
record to suggest that the GSA's defective pricing allegations
was material because Biggs admitted that plaintiffs would have
signed the 1998 agreement even if they had known about the
defective pricing allegation."  Def.'s Mem. at 25 (citing Biggs
Dep., Ex. 34 to Def.'s Mem. in Supp., at 366:1-25).

Plaintiffs, however, contend that (1) defendant never told
plaintiffs that auditors found defendant's prices were
defectively negotiated, Draft Audit Report, Att. 1, Ex. C to
Pls.' Opp'n, Biggs Aff. ¶ 6; (2) never disclosed that the
government told defendant it would no longer be able to sell its
products at the prices listed in defendant's MAS contract,
Saunders Dep., Att. 4 to Pls.' Opp'n, at 74-75; (3) never told
plaintiffs that defendant was the subject of government False
Claims Act allegations for defective pricing, Biggs Aff. ¶ 6; (4)
never told plaintiffs of the true nature of its settlement with
the government with regard to the $1.7 million in damages paid,
Answer and Counterclaims ¶ 31; Biggs Aff. ¶ 6; and (5) failed to
provide plaintiffs with or even acknowledge the existence of both
a draft and final audit report, Biggs Aff. ¶¶ 4, 6.

Plaintiffs then directly contradict defendant's assertion
that plaintiffs would not have acted differently if they had
known of defendant's defective pricing problems, noting that

25

defendant's citation to Biggs' deposition testimony is misleading. Biggs specifically stated that had he known of the defective pricing allegations, he "would have approached the schedule and the government completely different." Biggs Aff. ¶ 12; Koehl Aff. ¶ 9. Biggs' deposition testimony continues: "We would have said . . . we understand the products were defectively priced, we would have gone out, got some outside counsel, and helped build a model so that we could have been compliant with the government." Biggs Dep., Ex. 34 to Def.'s Mem. in Supp., at 366:21-25.[7] Accordingly, because there is a genuine dispute of material fact as to whether plaintiffs would have acted differently if defendant provided the defective pricing information, the Court finds that plaintiffs' fraud and negligent misrepresentation claims survive defendant's motion with regard to materiality.

**E.   Reasonable Reliance**

---

[7] Biggs' complete deposition testimony as to whether he and C&E would have acted differently if they had known about defendant's defective pricing problems is as follows: "Q: If [defendant] had told you that [defendant's products were defectively priced] in 1997, what would you have done differently? A: Oh, if they had told me that in 1997, I still think that those products could have been put on GSA Schedule. We would have just approached the schedule and the government totally different. We would have said, you know, we understand the products were defectively priced, we would have gone out, got some outside counsel, and helped build a model so that we could have been compliant with the government." Biggs Dep., Ex. 34 to Def.'s Mem. in Supp., at 366:21-25.

The reasonableness of a plaintiff's reliance is a "question of fact, for which disposition by summary judgment is generally inappropriate." *Cassidy v. Owen*, 533 A.2d 253, 256 (D.C. 1987). Nonetheless, a plaintiff cannot "close his eyes and blindly rely upon the assurances of another absent some fiduciary relationship or emergency." *In re U.S. Office Prods. Litig*, 251 F. Supp. 2d 58, 104 (D.D.C. 2003) (citing *Hercules & Co., Ltd.*, *v. Shama Rest. Corp.*, 613 A.2d 916, 934 (D.C. 1992)); *see also General Motors Acceptance Corp. v. Central Nat'l Bank of Matoon*, 773 F.2d 771, 779 (7th Cir. 1985) (reasoning reliance not justified if there is ample opportunity to discover the truth)).[8]

Defendant contends that plaintiffs cannot prove reasonable reliance. Defendant argues that, regardless of what defendant did or did not tell plaintiffs, any reliance by plaintiffs should have terminated by the end of March 1998 because plaintiffs received information from sources other than defendant about the alleged problems with the prices defendant charged for its products. Defendant points out that GSA contract specialist Sharon Flannery told Biggs that defendant's prices were "alleged defective" in early 1998. Inspector General Subject Interview,

---

[8]  Plaintiffs' reasonable reliance argument does not address the alleged principal/agent fiduciary relationship that plaintiffs contend existed with regard to their breach of fiduciary relationship claim, discussed below in section V. Instead, plaintiffs solely contend that their reliance on defendant's misrepresentations and omissions was reasonable.

Ex. 22 to Def.'s Mem. in Supp., at 4; Def.'s Mem. in Supp. at 27.
Accordingly, defendant argues that any reliance on defendant's
alleged omissions that the GSA had found its prices to be
defective should have ceased in March of 1998. *See* Koehl Dep.,
Ex. 39 to Def.'s Mem. in Supp., at 117:20-118:11; Merski Dec. ¶
3.

Plaintiffs, however, contend that defendant did not use
vague terms like "pricing problems" to describe the nature of the
GSA audit.  Plaintiffs claim that defendant made "very specific
representations concerning the nature of the pricing problems,
explicitly stating that they related to price reduction issues."
Kuchinski Dep. at 134-35, 160-61; Biggs Aff. ¶ 3.  Thus,
plaintiffs argue that defendant's representations were entirely
believable, just inaccurate.  In addition, plaintiffs point out
that, nevertheless, they did ask for assurance from defendant by
repeatedly asking defendant for a copy of the GSA audit report.
Kuchinski Dep. at 68-76; Biggs Aff. ¶ 4.  Defendant allegedly
denied that the GSA audit report existed and falsely informed
Biggs of the specific nature of the allegations in the audit
report.  Kuchinski Dep. at 160-61; Biggs Aff. ¶ 3.  Furthermore,
plaintiffs contend that Flannery neither informed plaintiffs of
the results of the GSA audit of defendant nor informed plaintiffs
that defendant's prices were "defective."  *See* Pls.' Statement of
Genuine Issues ¶ 5.

According to plaintiffs, it is only as a result of the information provided by the GSA during the course of its investigation and audit of plaintiffs that plaintiffs finally learned defendant's products were defectively priced.  During an interview on June 16, 2000, conducted by GSA-OIG investigator Sylvia Bergstedt, Biggs learned for the first time the true nature of defendant's audit.  Biggs Aff. ¶ 12; Biggs Dep., Att. 11 to Pls.' Opp'n, at 162-64; Pls.' Opp'n at 15.  Bergstedt informed Biggs that defendant's products would never be approved for plaintiffs' schedule because they were defectively priced. *Id.*

Reasonable reliance is a question of fact generally inappropriate for disposition at summary judgment.  *Cassidy*, 533 A.2d at 256.  Plaintiffs provide evidence supporting the claim that they did not blindly rely but rather reasonably relied on defendant's representations with regard to its GSA audit, and further, plaintiffs provide evidence that they attempted to obtain the GSA audit report from defendant.  Accordingly, the Court finds that plaintiffs' fraud and negligent misrepresentation claims survive defendant's motion with regard to reasonable reliance.

**F.    Statute of Limitations**

Under District of Columbia law, the statute of limitations for a fraud or negligent misrepresentation claim is three years.

*Richards v. Duke Univ.*, 480 F. Supp. 2d 222, 236 (D.D.C. 2007)

(citing D.C. Code § 12-301)); *King v. Kitchen Magic, Inc.*, 391

A.2d 1184, 1186 (D.C. 1978); *Clouser v. Temporaries, Inc.*, 730 F.

Supp. 1127, 1131 (D.D.C. 1989).  Although "[w]hat constitutes the

accrual of a cause of action is a question of law . . . [w]hen

accrual actually occurred in a particular case is a question of

fact."  *Diamond v. Davis*, 680 A.2d 364, 370 (D.C. 1996).

Accordingly, unless the determination of when a cause of action

accrued is "so clear that the court can rule on the issue as a

matter of law, the jury should decide the issue on appropriate

instructions."  *Brin v. S.E.W. Investors*, 902 A.2d 784, 795 (D.C.

2006) (citations and quotations omitted).

Pursuant to the discovery rule,[9] once a plaintiff "[1]

actually knows, or [2] with the exercise of reasonable diligence

would have known, of some injury, its cause-in-fact, and some

evidence of wrongdoing, then she is bound to file her cause of

action within the applicable limitations period, measured from

the date of her acquisition of the actual or imputed knowledge."

*Diamond*, 680 A.2d at 381.  The "imputed knowledge" component of

---

[9] In *Diamond*, the D.C. Court of Appeals noted that it "has
extended the discovery rule to many classes of cases, including
medical, legal and architectural malpractice actions and products
liability actions where the injury is a latent disease, *but has
declined to declare the rule applicable in all cases.*"  *Diamond*,
680 A.2d at 381 n.15 (emphasis added) (citing *Farris v. Compton*,
652 A.2d 49, 54 (D.C. 1994)).  Neither party contends that the
discovery rule is inapplicable in this case, and accordingly, the
Court need not address this issue.

the discovery rule is referred to as "inquiry notice," and the essential question for whether a plaintiff is on inquiry notice is whether the plaintiff has "exercised reasonable diligence under the circumstances in acting or failing to act on whatever information was available to him." *Ray v. Queen*, 747 A.2d 1137, 1142 (D.C. 2000). Although a fiduciary relationship between parties does not preclude a finding of inquiry notice, the nature of the relationship between the parties is "highly relevant to whether inquiry notice existed, *i.e.*, whether reasonable diligence required [a plaintiff] to suspect wrongdoing on [the defendant's] part." *Id*. at 1142 n.6.

Defendant contends that plaintiffs learned defendant's prices "were defective" by early 1998. Bergstedt Search Warrant, Ex. 19 to Def.'s Mem. in Supp., at 16. Defendant essentially makes the same arguments and points to the same evidence as it does with regard to whether plaintiffs reasonably relied on defendant's alleged misrepresentations. Defendant again asserts that in addition to actual notice, plaintiffs were aware that: (1) the GSA audited defendant's MAS contract; (2) the auditors found pricing issues with defendant's MAS contract, including sales by defendant to non-government customers at prices lower than those that had been offered to defendant's GSA customers; (3) the auditors alleged damages of at least $600,000 to $800,000; (4) defendant paid a settlement to resolve the

government's claims arising from the audit; and (5) defendant was cancelling its GSA contract.  Def.'s Statement of Material Facts ¶ 2; *see also* Roenick Dep., Ex. 11 to Def.'s Mem. in Supp., at 27:25-28:4; Biggs Dep., Ex. 9 to Def.'s Mem. in Supp., at 153:13-154:9, 160:14-22, 160:7-11, 166:17-24, 243:23-244:2.

Plaintiffs flatly reject the allegation that they had any knowledge of defective pricing prior to June 16, 2000.  Biggs denies that he was ever told of defective pricing problems prior to June 16, 2000, Biggs Aff. ¶ 11, and Flannery rejects the idea that plaintiffs knew about the defective pricing allegations and denies that she told plaintiffs about the defective pricing allegations against defendant, Flannery Dep. at 49.  Plaintiffs further contend that plaintiffs did make an inquiry of defendant, but defendant continued to conceal the true nature of the audit findings.  Kuchinski Dep. at 160-61; Biggs Aff. ¶ 4. Accordingly, because the commencement of the statute of limitations is a question of fact usually reserved for the jury and because there are genuine issues of material fact, the Court finds that plaintiffs' fraud and negligent misrepresentation claims survive defendant's motion with regard to the statute of limitations.

## III. Breach of the Implied Covenant of Good Faith and Fair Dealing

Count Five of plaintiffs' second amended complaint states a cause of action against defendant for breach of the implied

covenant of good faith and fair dealing.  All contracts contain an implied covenant of good faith and fair dealing.  *Allworth v. Howard Univ.*, 890 A.2d 194, 201 (D.C. 2006).  This implied covenant requires that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  *Id.* (citations and quotations omitted).  Accordingly, "[i]f the party to a contract evades the spirit of the contract, willfully renders imperfect performance, or interferes with performance by the other party, he or she may be liable for breach of the implied covenant of good faith and fair dealing."  *Id.* (citations and quotations omitted).

The component of good faith emphasizes "faithfulness to an agreed common purpose and consistency with the justified expectations of the other party."  *Allworth*, 890 A.2d at 201. Bad faith conduct including subterfuges and evasions violates the good faith component.  *Id.*  Impermissible bad faith action may be "overt or may consist of inaction."  *Id.*  The component of fair dealing "may require more than honesty," and emphasizes "reasonable rather than arbitrary or capricious action."  *Id.*

Defendant makes the same arguments with regard to plaintiffs' breach of implied covenant of good faith and fair dealing claim as it does with regard to plaintiffs' fraud and negligent misrepresentation claims.  In sum, defendant allegedly

disclosed all relevant information, and plaintiffs proximately caused their own injury.  According to defendant, "the undisputed evidence shows that [defendant] fully performed its obligations under the 1998 Agreement in good faith and that it was [p]laintiffs' own conduct which directly led to the harms they now allege."  Def.'s Mem. in Supp. at 32.  However, as emphasized above, plaintiffs contend and provide evidence alleging that defendant affirmatively misrepresented and omitted material facts.  Viewed in the light most favorable to plaintiffs, a reasonable jury could find that defendant's actions prevented or injured plaintiffs from receiving the fruits of their contract. For the same reasons as stated above, the Court finds that plaintiffs' breach of implied covenant claim survives defendant's motion.

Defendant also contends that plaintiffs' breach of implied covenant claim is barred by the statute of limitations.  The three year statute of limitations for fraud and negligent misrepresentation also applies to plaintiffs' breach of implied covenant claim.  *See* D.C. Code § 12-301(8).  As discussed above, because there are genuine disputes of material fact as to when plaintiffs had actual or inquiry notice, the Court finds that plaintiffs' breach of implied covenant claim survives defendant's motion with regard to the statute of limitations.

34

**IV.  Contributory Negligence: Fraud, Negligent Misrepresentation, Breach of the Implied Covenant of Good Faith and Fair Dealing**

Under District of Columbia law, contributory negligence will generally bar recovery on a claim for negligence.  *Dist. of Columbia v. Brown*, 589 A.2d 384, 388 (D.C. 1991); *see also Lynn v. Dist. of Columbia*, 734 A.2d 168, 172 (D.C. 1999) (holding a plaintiff "who is contributorily negligent is completely barred from recovery").  The District of Columbia has adopted the Restatement (Second) of Torts' definition of contributory negligence which explains: "[a] plaintiff's contributory negligence may be either (a) an intentional and unreasonable exposure of himself to danger created by the defendant's negligence, of which danger the plaintiff knows or has reason to know, or (b) conduct which, in respects other than those stated in Clause (a), falls short of the standard to which the reasonable man should conform in order to protect himself from harm."  *Brown*, 589 A.2d at 388 n.6.  The existence of both negligence and contributory negligence "are normally questions of fact for the jury."  *Lynn*, 734 A.2d at 172.  Accordingly, "[o]nly in exceptional cases is evidence so clear and unambiguous that contributory negligence should be found as a matter of law."  *Id.* (citing *Tilghman v. Johnson*, 513 A.2d 1350, 1351 (D.C. 1986)).

Defendant contends that plaintiffs' contributory negligence bars recovery for plaintiffs' fraud, negligent misrepresentation,

and breach of the implied covenant of good faith and fair dealing claims.  Contributory negligence essentially deals with the question of whether the plaintiff acted reasonably under the circumstances.  *See Lynn*, 734 A.2d at 172.  Accordingly, with regard to defendant's contributory negligence defense, defendant makes the same arguments and points to the same evidence as it did with regard to whether plaintiffs reasonably relied on defendant's alleged misrepresentations or omissions.  Because there are genuine disputes of material fact as to whether plaintiffs acted reasonably under the circumstances, and because contributory negligence should only be found as a matter of law in "exceptional cases," the Court finds that plaintiffs' fraud, negligent misrepresentation and breach of the implied covenant of good faith and fair dealing claims survive defendant's contributory negligence defense.[10]

---

[10]  In addition, with regard to fraud, defendant's argument also fails because contributory negligence is not a bar to a fraud claim.  *Field v. Mans*, 516 U.S. 59, 70 (1995) ("[C]ontributory negligence is no bar to recovery because fraudulent misrepresentation is an intentional tort.").  With regard to the implied covenant claim, defendant's argument also seemingly fails because contributory negligence is not likely a bar to an implied covenant claim.  *Cf. Fortier v. Dona Anna Plaza Partners*, 747 F.2d 1324, 1337 (10th Cir. 1984) (holding contributory negligence not a defense to a breach of contract claim); *Karma Constr. Co., Inc. v. King*, 296 A.2d 604, 605 (D.C. 1972) (reasoning "contributory negligence is a good defense to an action based on *negligence*") (emphasis added); *Attorneys Title Corp. v. Chase Home Mortgage Corp.*, 1996 WL 470375, at *2 (D.D.C. Aug. 12, 1996) (reasoning the converse of the holding in *Karma* must be true: "contributory negligence is not a good defense to an action not based on negligence").

**V.    Breach of Fiduciary Duty**

Count Six of plaintiffs' second amended complaint states a cause of action against defendant for breach of fiduciary duty. Defendant contends that plaintiffs' claim must fail because plaintiffs and defendant were not in a fiduciary relationship. Furthermore, defendant contends that it satisfied any duty it allegedly may have owed plaintiffs by informing plaintiffs that the government audited defendant's MAS contract and found problems with defendant's pricing.[11]

An agency "is the fiduciary relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control." *Lott v. Burning Tree Club*, 516 F. Supp. 913, 917 (D.D.C. 1980) (quoting Restatement (Second) of Agency § (1)(1)).  An agency relationship consists of a agent subject to the control of a principal, and the factors relevant to whether an agency relationship exists include: "(1) the selection and engagement of the servant, (2) the payment of wages, (3) the power to discharge, (4) the power to control the servant's conduct, (5) and whether the work is part of the regular business of the employer." *Judah v. Reiner*, 744 A.2d 1037, 1040 (D.C. 2000) (citations and quotations omitted).  Generally, the determinative

---

[11]    This specific contention is rejected for the reasons stated in section II.D.

factor is "whether the employer has the right to control and direct the servant in the performance of his work and the manner in which the work is to be done."  *Id.*

Further, in determining whether an agency relationship exists, courts examine both "the terms of [the] contract . . . and . . . the actual course of dealings between the parties." *Id.*  If an agency exists, it imposes a duty upon a principal to "deal with the agent fairly and in good faith, including a duty to provide the agent with information about risks of physical harm or pecuniary loss that the principal knows, has reason to know, or should know are present in the agent's work but unknown to the agent."  Restatement (Third) of Agency § 8.15.[12]

Defendant contends that plaintiffs and defendant were sophisticated corporate entities dealing with one another at arm's length.  Plaintiffs, however, assert that pursuant to the 1987 Agreement between the parties, the relationship between plaintiffs and defendant was that of principal and agent.  1987

---

[12] There is no District of Columbia law adopting the Restatement (Third) of Agency § 8.15.  However, the District of Columbia has adopted the approach of several Restatement (Second) of Agency provisions, and in addition, the Restatement (Second) of Agency has been cited with approval.  *See, e.g., Erby v. United States*, 424 F. Supp. 2d 180, 184 (D.D.C. 2006) (explaining the District of Columbia has adopted the approach of the Restatement (Second) of Agency § 228); *Glekas v. Boss & Phelps, Inc.*, 437 A.2d 584, 589 (D.C. 1981) (noting District of Columbia has adopted the approach of the Restatement (Second) of Agency § 378); *Davey v. King*, 595 A.2d 999, 1003 (D.C. 1991) (citing Restatement (Second) of Agency § 378).

Agreement at ASH 002430.  In its reply, defendant asserts that
the 1998 Agreement amended the prior principal/agent relationship
into one of contractor and subcontractor, and accordingly, under
the 1998 Agreement, neither party was subject to the control of
the other.  While this contention appears to be correct,
defendant does not address plaintiffs' argument that the 1987
Agreement involving the agent/principal relationship was in
effect when defendant allegedly made its misrepresentations.  *See*
Kuchinski Dep. at 151-54.  Because the 1987 agreement creating a
principal/agent relationship between plaintiffs and defendant was
in effect when defendant allegedly made its representations, and
because a principal has a duty to "deal with the agent fairly and
in good faith, including a duty to provide the agent with
information about risks of physical harm or pecuniary loss that
the principal knows, has reason to know, or should know are
present in the agent's work but unknown to the agent,"
Restatement (Third) of Agency § 8.15., the Court finds that
plaintiffs' breach of fiduciary duty claim survives defendant's
motion.

## VI.   Indemnification Under Defendant's By-Laws

Count Three of plaintiffs' second amended complaint states a
cause of action against defendant for indemnification under
defendant's By-Laws.  The principles governing the construction
of contracts also govern the construction of by-laws.  *See*

39

*Johnson v. Fairfax Vill. Condo. IV Unit Owners Ass'n*, 548 A.2d
87, 91 (D.C. 1988) (applying contract interpretation rules to
association by-laws).  A contract's ambiguity is a matter of law.
*See e.g., Repub. Nat. Comm. v. Taylor*, 299 F.3d 887, 892-93 (D.C.
Cir. 2002); *Gryce v. Lavine*, 675 A.2d 67, 69 (D.C. 1996).  A
contract is not rendered ambiguous simply because the parties
disagree as to the meaning or interpretation of the contract.
*Gryce*, 675 A.2d at 69.  Instead, a contract is ambiguous only
when "the contract is, or the provisions in controversy are,
reasonably or fairly susceptible of different constructions or
interpretations, or of two or more different meanings."  *Id.*
(citations and quotations omitted); *see also Bennett Enter. Inc.
v. Domino's Pizza, Inc.*, 45 F.3d 493, 497 (D.C. Cir. 1995).  In
deciding whether an interpretation is reasonable the Court
considers the intent of the parties entering the agreement and
whether a reasonable person in the position of the parties,
knowing the circumstances surrounding the agreement and the
usages that either party knew or should have known, would find it
reasonable.  *See Potomac Elec. Power Co. v. Mirant Corp.*, 251 F.
Supp. 2d 144, 149 (D.D.C. 2003) (citing *Intercounty Constr. Corp.
v. Dist. of Columbia*, 443 A.2d 29, 32 (D.C. 1982)).

Plaintiffs claim that pursuant to defendant's By-Laws,
defendant is required to indemnify Biggs for expenses he
reasonably incurred as a result of the criminal investigation and

suspension proceedings.  2d Am. Compl. ¶ 83.  With regard to
indemnification under defendant's By-Laws, a "Covered Person"
includes employees who are no longer with the company.  Ashland
By-Laws, Ex. 44 to Def.'s Mem. in Supp., at Art. IX § 1.  A
covered person "shall be indemnified" against his involvement in
an investigation or proceeding "by reason of the Covered Person's
being or having been an officer or employee of [defendant] . . .,
or by reasons of any action taken or not taken in such capacity."
*Id.*  Plaintiffs assert that because Biggs was a former employee,
and therefore a "Covered Person" under defendant's By-Laws, and
because Biggs acted in good faith, in what he believed was in the
best interests of Ashland, Biggs should therefore be indemnified.
*See* Ashland By-Laws at Art. IX § 1(b) ([A] "Covered Person . . .
shall be indemnified . . . if the Covered Person: . . . (b) acted
in good faith, in what the Covered Person reasonably believed to
be the best interests of [defendant.]")

Defendant contends that the legal expenses for which Biggs
seeks indemnification were incurred over 11 years after he ceased
to be defendant's employee.  Pursuant to plaintiffs'
interpretation of the By-Laws, any former employee of the company
would be able to obtain indemnification for any action, related
or unrelated to defendant, if his or her past association with
the company had contributed to a negative or critical assessment
of him.  Defendant contends that Biggs was neither investigated

because of his prior position with defendant, nor because of his actions or inactions on behalf of defendant, but rather was investigated and suspended because of plaintiffs' efforts to sell defendant's products.

The indemnification clause of the By-Laws as a whole repeatedly refers to actions undertaken on behalf of, or in the best interests of, the company, and as defendant argues, the intent of the document is to protect employees during their tenure at the company.  Ashland By-Laws at Art. IX § 1.  The only reasonable interpretation of the phrase offered by Biggs as the basis of his right to indemnification, *i.e.*, that he incurred his costs "by reasons of . . . having been an employee" is that defendant must indemnify employees who have incurred legal costs rooted in events occurring while they were employees, even if those costs become known after they have left.  Plaintiffs assert that it is because of Biggs' prior employment with defendant that the government was convinced that plaintiffs must have known about the true nature of defendant's defective pricing problems.  However, while the prior relationship may have given rise to the GSA's suspicion and subsequent investigation of plaintiffs, it is clear that Biggs was investigated solely because of actions taken as the chief executive officer of C&E, in the interest of C&E.  Accordingly, plaintiffs have not provided any factual basis to conclude that the GSA investigation was based on events during

42

Biggs' tenure with defendant, and therefore, the Court grants
defendant's motion with regard to plaintiffs' indemnification
claim.

## VII. Equitable Indemnification

Count Four of plaintiffs' second amended complaint states a
cause of action against defendant for equitable indemnification.
Indemnity generally operates to "shift[] . . . the entire loss
from one who has paid it to another who would be unjustly
enriched at the indemnitee's expense by the indemnitee's
discharge of the obligation." *Johnson v. Mercedes-Benz, USA,
LLC*, 182 F. Supp. 2d 58, 65 (D.D.C. 2002) (quoting *Dist. of
Columbia v. Washington Hosp. Ctr.*, 722 A.2d 332, 340 (D.C.
1998)).  Indemnification may be "implied in fact (on an implied
contract theory)." *Johnson*, 182 F. Supp. 2d at 65 (quoting *R. &
G. Orthopedic Appliances and Prosthetics, Inc. v. Curtin*, 596
A.2d 530, 544 (D.C. 1991)).  In addition, equitable
indemnification may be "implied in law in order to achieve an
equitable result and prevent injustice." *Machesney v. Bruni*, 905
F. Supp. 1122, 1135 (D.D.C. 1995).  Equitable indemnification may
also be implied "out of a relationship between the parties, to
prevent a result which is regarded as unjust or unsatisfactory."
*Quadrangle Dev. Corp. v. Otis Elevator Co.*, 748 A.2d 432, 435
(D.C. 2000) (citations and quotations omitted).  An agency
relationship has been held to support a claim for

indemnification.  *Myco, Inc. v. Super Concrete Co., Inc.*, 565
A.2d 293, 299 (D.C. 1989).

However, "[a] duty to indemnify may arise from an express
contract provision *or, in the absence of a contract*, where
indemnification is required to prevent injustice."  *Quadrangle*,
748 A.2d at 435 (emphasis added).  An obligation to indemnify may
be implied, "[w]here there is no express contract provision."
*Quadrangle*, 748 A.2d at 435.  Plaintiffs assert that plaintiffs
and defendant operated under a principal/agent relationship, and
therefore the agency relationship implies a promise on the part
of the principal to repay or reimburse his agent for losses of
expenditures as may result from the performance of his agency.
*See Giovannoni v. Waple & James, Inc.*, 105 F.2d 108, 110 (D.C.
Cir. 1939).  However, the 1987 Agreement creating the
principal/agent relationship specifies that:

> [C&E] shall be solely liable for, and shall hold Company
> harmless from and against, any and all liability of any
> kind including but not limited to, direct, indirect,
> special or consequential damages, which arise from or due
> to, [C&E]'s unauthorized promotion of any Products for
> any application or use other than as described in the
> aforesaid Product Data Sheets and Product Application
> Bulletins.

1987 Agreement ¶ 2(e).  Thus, as defendant points out, the
relationship between plaintiffs and defendant was contractual,
and the specific contractual indemnification provision precludes
plaintiffs from seeking equitable indemnification.  *Cf.*
*Quadrangle*, 748 A.2d at 435 (holding equitable indemnification

44

may be implied "[w]here there is no express contract

provision").[13]  In addition, a prerequisite for a claim for

equitable indemnification "is that the party seeking it

(indemnitee) have discharged the liability for the party against

whom it is sought."  *Dist. of Columbia v. Washington Hosp. Ctr.*,

722 A.2d at 341.  The legal fees and lost business opportunities

sought by plaintiffs are not tort liabilities shared by

plaintiffs and defendant, but rather plaintiffs' own alleged

injuries.  Accordingly, plaintiffs have not discharged any of

defendant's liabilities.  Therefore, the Court grants defendant's

motion with regard to plaintiffs' equitable indemnification

claim.

## VIII. Plaintiffs' Motion to Strike

Plaintiffs move the Court to strike defendant's motion for

summary judgment or in the alternative to disregard certain

---

[13] The Restatement (Third) of Agency § 8.14 adopts a similar
approach with regard to express contractual provisions precluding
indemnification: "A principal has a duty to indemnify an agent
(1) *in accordance with the terms of any contract between them*;
*and* (2) *unless otherwise agreed*, (a) when the agent makes a
payment (I) within the scope of the agent's actual authority, or
(ii) that is beneficial to the principal, unless the agent acts
officiously in making the payment; or (b) when the agent suffers
a loss that fairly should be borne by the principal in light of
their relationship."  Restatement (Third) of Agency § 8.14
(emphasis added); *see also id*. cmt b (explaining "[a] contract
between a principal and an agent may anticipate the possibility
that the agent will incur pecuniary loss, specify when and to
what extent the principal has a duty to indemnify the agent, and
prescribe procedures to be followed by the agent in claiming
rights to indemnity under the contract").

evidence submitted in support thereof.  Defendant does not base its indemnification and equitable indemnification arguments on evidence disputed by plaintiffs in their motion, and defendant's motion was only granted with regard to those claims.  As defendant's motion is denied with regard to all other claims, the Court denies plaintiffs' motion to strike as moot.

### CONCLUSION

For the foregoing reasons, the Court **GRANTS in part and DENIES in part** defendant's motion for summary judgment.  The motion is granted with regard to Count Three (indemnification) and Count Four (equitable indemnification), and the motion is denied with regard to all other counts.  The Court **DENIES** plaintiffs' motion to strike as moot.  An appropriate Order accompanies this Memorandum Opinion.

**Signed:      Emmet G. Sullivan**
              **United States District Judge**
              **August 2, 2007**